IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| HECTOR RUIZ, | § § § § | |
| Plaintiff, | § § | |
| V. | § § | CIVIL ACTION NO. 4:16-cv-00434 |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | § § § § | |
| Defendant. | § § § | |

## MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge [1] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 13), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 14), and Defendant's Cross Motion for Summary Judgment (Document No. 9). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Cross Motion for Summary Judgment (Document No. 9) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on March 22, 2017 (Document No. 5).

# I. Introduction

Plaintiff, Hector Ruiz ("Ruiz") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying his application for supplemental security income ("SSI"). Ruiz argues that the Administrative Law Judge ("ALJ"), D'Lisa Simmons, committed legal error when she found that Ruiz was not disabled. Ruiz argues that the ALJ's credibility determination was improper, that the ALJ failed to properly weigh the medical opinion of record, and that the ALJ's residual functional capacity assessment was internally inconsistent and not supported by substantial evidence. Ruiz seeks an order reversing the ALJ's decision and awarding benefits or, in the alternative, remanding his claim for additional administrative proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Ruiz was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

# II. Administrative Proceedings

On July 1, 2011, Ruiz filed for SSI claiming he had been disabled since October 1, 2009, due to impairments that became disabling on July 1, 2011 (Tr. 522-526).[2] These impairments included anxiety-related disorders, back and neck pain, chronic pancreatitis, and affective mood disorders, (Tr. 394-395). The Social Security Administration denied his application initially on September 28, 2011, and upon reconsideration on February 27, 2012. (Tr. 427-430). Ruiz then requested a hearing before an ALJ. (Tr. 435-438). The Social Security Administration granted

---

[2] Ruiz amended his alleged disability onset date to July 1, 2011 at the October 26, 2012, hearing. (Tr. 349, 678-679).

his request, and the ALJ held a hearing on October 26, 2012. (Tr. 342-393). On January 25, 2014, the ALJ issued her decision finding Ruiz not disabled. (Tr. 396-415).

Ruiz sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 469-472). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused her discretion; (2) the ALJ made an error of law in reaching her conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest, or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Ruiz's contentions in light of the applicable regulations and evidence, the Appeals Council, on April 1, 2014, granted the request for review under the substantial evidence provision of the Social Security Administration regulations. The Appeals Council vacated the ALJ's hearing decision and remanded this case to the ALJ for further consideration of evidence concerning back injuries from a motor vehicle accident in June 2012, hearing loss, and high Body Mass Index (BMI). The Appeals Council also required the ALJ to explain the inconsistency between Ruiz's residual functional capacity limitation to a range of light work and the ALJ's decision that Ruiz had no functional limitations.

The ALJ held a second hearing on December 11, 2014. (Tr. 284-341). On March 13, 2015, the ALJ issued her decision finding Ruiz not disabled. (Tr. 251-283). Ruiz against sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 248-250). The Appeals Council, on December 9, 2015, concluded that there was no basis upon which to grant Ruiz's request for review. (Tr. 1-5). The ALJ's findings and decision thus became final.

Ruiz has timely filed his appeal of the ALJ's decision. The Commissioner has filed a Cross Motion for Summary Judgment (Document No. 9). Likewise, Plaintiff has filed a Motion for

Summary Judgment (Document No. 13). The Commissioner has also filed a Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 14). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 2373. (Document 4-2). There is no dispute as to the facts contained therein.

### III. Standard for Review of Agency Decision

The Court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Moreover, Section 405(g) of Title 42 of the Social Security Act limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment upon the pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision." *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [H]e is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [he] lives, or whether a specific job vacancy exists for [him], or whether [he] would be hired if [he] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in

any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting

*Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;
2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;
3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;
4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and
5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.* at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925

F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the

first four steps of the analysis to establish that a disability exists. If successful, the burden shifts

to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v.*

*Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs

are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*,

914 F.2 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that

the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in her March 13, 2015, decision that Ruiz was

not disabled at step five. In particular, the ALJ determined that Ruiz had not engaged in substantial

gainful activity since July 1, 2011 (step one); that Ruiz's bipolar disorder, hearing loss, and

degenerative disc disease of the lumbar spine and cervical spine were severe impairments (step

two); that Ruiz did not have an impairment or combination or impairments that met or medically

equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (step three); that

Ruiz had the RFC to perform a wide range of light work. In particular,

[T]he claimant has the residual functional capacity to perform a wide range of light work . . . [T]he claimant was limited to lift, carry, push, and pull twenty pounds, occasionally, and ten pounds, frequently. The claimant was able to sit, stand, and walk for six hours each throughout an eight-hour workday. Due to tendonitis of the left shoulder, the claimant was unable to perform overhead reaching with the left upper extremity. The claimant was right hand dominant. The claimant was able to occasionally crawl, crouch, kneel, stoop, and climb ramps and stairs . . . [T]he claimant required the option to alternate between sitting and standing every hour . . . was limited to performing simple, routine, repetitious work with one or two or three step instructions . . . was limited to a supervised [regular supervision as normally provided to employees], low stress environment requiring few decisions . . . was limited to only occasional interaction with co-workers and supervisors and no interaction with the general public. Due to limitations in concentration, persistence, and pace, the claimant was unable to work with strict production quotas and fast production rate pace . . . unable to work in a noisy work environment, such as construction work or work on a highway, without noise protection. The claimant was able to frequently operate a motor vehicle . . . was limited to occasional exposure to environments with extreme cold, vibration, wetness, and humidity . . . limited to occasional exposure to hazardous work environments involving dangerous machinery. The claimant could not be exposed to hazardous work environments involving unprotected heights and climbing ropes, ladders, or scaffolding. (Tr. 261-262).

The ALJ further found that Ruiz was unable to perform any past relevant work (step four); and that, based on Ruiz's age, marginal education, work experience, and residual functional capacity, Ruiz could perform work as a laundry folder, a non-postal mail clerk, and a price tagger, and that Ruiz was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining, and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

### A. Objective Medical Facts

The objective medical evidence shows that Ruiz has been treated for bipolar disorder, hearing loss, degenerative disc disease of the lumbar spine and cervical spine, pancreatitis, Barrett's Esophagus, insomnia, depression, and erectile dysfunction (Tr. 942-2373). He is diabetic (Tr. 315) and obese (Tr. 1328-1329). The medical records from the relevant period of time, January 8, 2008, through July 13, 2015, show that Ruiz received medical care for these impairments at a number of hospitals and clinics in Texas.[3]

On January 13, 2010, Ruiz visited Healthcare for the Homeless – Houston Cathedral as a new patient. (Tr. 856-859). A physical examination and mental status examination diagnosed him with depression, insomnia, GERD, and dental disorder, as well as drug and alcohol abuse in

_____

[3] From January 8, 2008, through December 31, 2008, he received medical care at CHRISTUS Spohn Hospital Corpus Christi – Memorial in Corpus Christi, Texas. (Tr. 757-800). From November 6, 2009, through December 27, 2010, Ruiz received medical treatment from Laredo Medical Center – Mercy Hospital. (Tr. 801-815). During this period of time, Ruiz also received medical treatment at LBJ General Hospital from January 7, 2010, through February 21, 2010. (Tr. 816-853). From January 13, 2010, through June 28, 2011, and from September 2, 2010, through November 8, 2011, Ruiz received medical treatment from Healthcare for the Homeless – Houston. (Tr. 854-941, 1464-1492). From February 22, 2010, through May 16, 2011, and from December 19, 2011, through August 29, 2012, and from June 26, 2013, through May 19, 2014, and from March 18, 2014, through October 25, 2014, Ruiz received treatment from Ben Taub General Hospital. (Tr. 942-1021, 1373-1422, 1606-1659, 2125-2373). From September 23, 2010, through July 7, 2011, and from September 1, 2011, through August 29, 2012, and from September 17, 2012, through November 12, 2013, he received treatment from Northwest Health Clinic (Tr. 1022-1135, 1314-1372, 1532-1605). From June 7, 2012, through August 21, 2012, and on February 27, 2013, he received medical treatment from Campbell Medical Clinic (Tr. 1436-1456, 1530-1531). From May 8, 2012, through July 16, 2012, and from August 27, 2013, through May 29, 2014, and from August 23, 2013, through September 12, 2014, Ruiz received treatment from Memorial Hermann NW Hospital (Tr.1496-1504, 1660-1707, 2105-2124). Ruiz also received treatment from Squatty Lyons Clinic from April 11, 2012, through November 4, 2014. (Tr. 1732-2101). From April 30, 2015, through July 13, 2015, Ruiz received medical treatment from Houston Methodist Hospital. (Tr. 6-247).

remission. (Tr. 859). Dr. Henao prescribed sleep and depression medication and scheduled Ruiz for a psychological evaluation on February 2, 2010. On January 14, 2010, Ruiz's return visit revealed an additional problem of dental pain (Tr. 864).

On February 5, 2010, Ruiz visited LBJ Emergency Center complaining of abdominal pain. (Tr. 827). He was diagnosed with pancreatitis, gastritis, PUD, and bowel obstruction. (Tr. 827-833). The doctor also noted a history of cannaboid and cocaine use. (Tr. 833).

On February 11, 2010, Ruiz returned to Healthcare for the Homeless – Houston Cathedral complaining of insomnia and gastric problems. He requested a refill on his medication for depression and insomnia. (Tr. 870). He was diagnosed with a new problem, pancreatitis. (Tr. 873). On February 26, 2010, Ruiz was treated for anxiety and erectile dysfunction. (Tr. 868). He reported that insomnia had improved. (Tr. 868). On February 21, 2010, Ruiz complained of abdominal pain lasting three to four days, which the doctor diagnosed as diverticulosis and pancreatitis. (Tr. 817-826). He was sent home on the same day.

On March 9, 2010, Ruiz visited Healthcare for the Homeless for a psychiatric consultation with Dr. Wanda J. Henao (Tr. 881-887). Ruiz stated that he had been homeless for about seven years. He had stopped working as a drummer about six to seven years prior because he could not concentrate and kept forgetting the base line. (Tr. 881). He reported that he subsequently worked in construction, but memory problems also interfered with his ability to perform that job. His last job was cleaning up after Hurricane Ike. (Tr. 881).

Ruiz further complained of difficulty lifting things with his right arm because of pain in his right wrist and elbow. He also reported anxiety, insomnia, and hearing voices, which he now ignores. (Tr. 881). Ruiz also stated that he was involved in a drunken brawl six years prior and was beaten by several people, hospitalized for a month and a half, and suffered severe head trauma.

9

(Tr. 881-882). He reported a long history of polysubstance abuse since the age of thirteen that resulted in two accidental overdoses on cocaine eight and ten years prior, requiring hospitalizations in Laredo and Mercy Hospital, as well as four DWI's and one incarceration for possession of marijuana, totaling six years of jail time. (Tr. 882).

Dr. Henao's psychiatric evaluation revealed that Ruiz was not depressed and did not exhibit evidence of hallucinations and delusions. (Tr. 885). Dr. Henao noted that Ruiz could name simple objects, follow simple instructions, distinguish between left and right, write a sentence, and copy a geometric shape, as well as understand the causes and consequences of disorder (Tr. 886). Dr. Henao had difficulty understanding Ruiz due to his Spanish accent and noted that Ruiz's thought processes were slowed and that he was incapable of abstract thinking and math calculations. (Tr. 885-886). Dr. Henao opined that Ruiz was "a bit obsessive about wanting to obtain Viagra" (Tr. 886). Dr. Henao concluded that Ruiz "has had years of severe alcohol and crack cocaine abuse as well as a history of severe head trauma from beating while he was uncons[c]ious resulting in hospitalization." (Tr. 886). Dr. Henao recommended that Ruiz follow up with Dr. David S. Buck at Gulfgate for his pancreatitis, joint problems, memory issues, and continued prescriptions, and return in one month for reassessment. (Tr. 887).

On September 26, 2011, Dr. Mark Schade, Ph.D., completed a psychiatric review technique. (Tr. 1139). Dr. Shade diagnosed Ruiz with anxiety-related disorders and alcohol abuse (Tr. 1139,1148), but stated that there was insufficient evidence to determine Ruiz's functional limitations, such as restriction of daily living activities, difficulties in maintaining social function, difficulties in maintaining concentration, persistence, or pace, and episodes of decompensation. (Tr. 1149).

10

On January 3, 2012, Dr. Hanna J. Abu-Nassar at MedTex – Medical Testing and Examinations Center of Houston performed an internal medicine examination on Ruiz (Tr. 1154-1161). Dr. Abu-Nassar noted that Ruiz's recollection of his medical history is fragmented due to memory problems (Tr. 1154). Dr. Abu-Nassar found that Ruiz suffered from vision problems, identified possible early cirrhosis of the liver, as well as possible colon cancer, but this result was uncorroborated. (Tr. 1157).

On January 19, 2012, Dr. Rebecca Fisher, a licensed psychologist, performed a consultative examination. (Tr. 1165). Dr. Fisher diagnosed Ruiz with "Major Depressive Disorder Severe Without Psychotic Features" and "Generalized anxiety disorder." Ruiz had a GAF of 50.[4] (Tr. 1165). Dr. Fisher opined that Ruiz "understands the meaning of filing for benefits. He is capable at the present time to manage his funds." (Tr. 1165, 1168).

From January 8, 2008, through December 31, 2008, Ruiz received medical care at CHRISTUS Spohn Hospital Corpus Christi – Memorial in Corpus Christi, Texas. (Tr. 757-800). The records show that Ruiz was treated by Dr. Richard R. Evans on January 8, 2008. (Tr. 768-773). On January 8, 2008, Dr. Evans performed an esophagogastroduodenoscopy[5] to treat Ruiz's

---

[4] GAF stands for "Global Assessment of Functioning." It is a scale from 0 to 100 that allows mental health providers to evaluate the psychological, social, and occupational functioning of adult patients on a hypothetical continuum of mental health illness. *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) at page 34. https://msu.edu/course/sw/840/stocks/pack/axisv.pdf. GAF of 50 falls within the 41-50 category, which indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." The 91-100 category indicated "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualifies. No symptoms." The 1-10 category indicates "Persistent danger of severely hurting self or others (e.g. recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

[5] Esophagogastroduodenoscopy is a procedure to diagnose and treat upper gastrointestinal problems. *See*

upper gastrointestinal bleeding, rectal bleeding, and vomiting of blood. (Tr. 773). Dr. Evans diagnosed Ruiz with Barrett's Esophagus with a large refluxing hiatus hernia and stated that Ruiz "need[ed] to be on proton pump inhibitor indefinitely. He definitely needs to be off of alcohol." (Tr. 773).

On January 7, 2010, Ruiz went to the LBJ Emergency Department complaining of abdominal pain lasting for more than three days and vomiting fifteen times that day after relapsing into alcohol abuse and consuming forty beers the previous week (Tr. 846). Dr. Kim Nguyen diagnosed Ruiz with epigastric pain, chronic pancreatitis, alcohol abuse, and polysubstance abuse, and advised Ruiz to "follow up with the alcohol rehab program." (Tr. 843). On January 11, 2010, Ruiz went to the LBJ Emergency Center complaining of a painful rash on his back. (Tr. 837-853). Dr. Kim Nguyen diagnosed Ruiz with cellulitis of the back and advised him to avoid popping pimples on his back. (Tr. 841-842). Also on January 11, 2010, Ruiz went to the LBJ Emergency Department complaining "My stomach is killing me," (Tr. 834), and Dr. M. Sherman pointed to Ruiz's alcoholism and consumption of alcohol three days before.

On March 17, 2010, Ruiz returned for a GERD follow-up and complained of dental pain due to the removal of upper teeth and sutures (Tr. 877). He also requested refills of Pepcid and a prescription for Viagra, as well as more Trazodone for insomnia and depression. (Tr. 877). On March 23, 2010, Ruiz returned again for medication and complained that he had suffered pain in his right wrist for one month following an accident, as well as short term memory loss for seven years. (Tr. 874). After his follow-up with Dr. David S. Buck, he was diagnosed with a new problem, unspecified concussion; his drug and alcohol abuse was considered in remission, and his

---

http://www.hopkinsmedicine.org/healthlibrary/test_procedures/gastroenterology/esophagogastro duodenoscopy_92,P07717/

erectile dysfunction was unchanged. (Tr. 875). Dr. Buck referred Ruiz for neuropsychological testing, and prescribed Viagra for the erectile dysfunction, as well as painkillers for the arm pain. (Tr. 876).

On July 8, 2012, Ruiz visited Ben Taub General Hospital's Psychiatric Emergency Center complaining of being "very depressed" (Tr. 1390). He received an initial psychiatric evaluation by physician Dr. Kriste Babbitt (Tr. 1383-1392). The results showed that he had no persistent depressed mood but suffered from hopelessness, insomnia, fatigue, guilt, and anxiety regarding a relapse into substance abuse. (Tr. 1383). He was "slightly distractible, requir[ing] restatement of questions and redirection at times" (Tr. 1384); "his mood appear[ed] anxious"; (Tr. 1391); "his speech [was] tangential" (Tr. 1391) and "he [was] hyperactive . . . [and] inattentive" (Tr. 1391), but he did not have delusions (Tr. 1391) and possessed basic vocabulary and the appropriate amount of knowledge for his education level (Tr. 1384).

Dr. Amita Hegde, M.D., a disability determination physician, completed a Residual Functional Capacity Assessment on February 21, 2012. (Tr. 1170-1177). Dr. Hegde diagnosed Ruiz with a primary diagnosis of "history of pancreatitis." (Tr. 1170). In terms of Exertional Limitations, Ruiz was able to "occasionally lift and/or carry (including upward pulling)" 20 pounds; "frequently lift and/or carry (including upward pulling)" 10 pounds; "stand and/or walk (with normal breaks) for a total of . . . about 6 hours in an 8-hour workday"; "sit (with normal breaks) for a total of . . . about 6 hours in an 8-hour workday," and "push and/or pull (including operation of hand and/or foot controls) . . . unlimited, other than as shown for lift and/or carry." (Tr. 1171). Ruiz had no Postural Limitations in climbing, balancing, stooping, kneeling, crouching, and crawling. (Tr. 1172). He also had no Manipulative Limitations, such as reaching, feeling, and using his fingers and hands. (Tr. 1173). Ruiz further had no visual limitations, despite his claim

that he had vision problems. (Tr. 1173). He also had no Communicative Limitations (hearing and speaking) or Environmental Limitations, such as extreme cold, extreme heat, wetness, humidity, noise, vibration, hazards, and fumes, odors, dusts, gases, and poor ventilation. (Tr. 1174). Dr. Hedge concluded that the "symptoms are not wholly credible or supported by medical evidence." (Tr. 1175), that Ruiz had a history of chronic alcoholism and pancreatitis caused by alcohol, as well as possible early cirrhosis of the liver. (Tr. 1177).

Dr. Matthew Turner completed a Residual Functional Capacity Assessment on February 22, 2012. (Tr. 1192-1195). As for Understanding and Memory, Dr. Turner opined that Ruiz was not significantly limited in his "ability to remember locations and work-like procedures" and in his "ability to understand and remember very short and simple instructions," but he was markedly limited in his "ability to understand and remember detailed instructions." (Tr. 1192). In terms of Sustained Concentration and Persistence, Ruiz was not significantly limited in his "ability to carry out very short and simple instructions"; "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "to sustain an ordinary routine without special supervision," and "to make simple work-related decisions." (Tr. 1192). He was moderately limited in his "ability to maintain attention and concentration for extended periods"; to "work in coordination with or proximity to others without being distracted by them," and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 1192-1193). However, he was markedly limited in his "ability to carry out detailed instructions." (Tr. 1192). With respect to Social Interaction, Ruiz was not significantly limited in his "ability to interact appropriately with the general public," or "to ask simple questions or request assistance," or "to maintain socially appropriate behavior and to adhere to basic standards of neatness and

14

cleanliness." (Tr. 1193). He was moderately limited in his ability to "accept instructions and respond appropriately to criticism from supervisors" and "get along with coworkers or peers without distracting them or exhibiting behavioral extremes" (Tr. 1193). Finally, in terms of Adaptation, Ruiz was not significantly limited in his ability to "be aware of normal hazards and take appropriate precautions" and "travel in unfamiliar places or use public transportation," but was moderately limited in his ability to "respond appropriately to changes in the work setting" and "set realistic goals or make plans independently of others." (Tr. 1193). Dr. Turner concluded:

> Symptoms are not wholly credible or supported by medical evidence. . . Claimant can understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors and respond appropriately to changes in routine work settings. (Tr. 1194).

A Psychiatric Review Technique performed on the same day by Dr. Turner corroborated his findings from the Mental Residual Functional Capacity Assessment:

> The clmt [claimant] is somewhat limited by psychiatric sx [symptoms], but the impact of these sx does not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis. Functional limitations are less than marked. The alleged severity & limiting effects from the impairments are not wholly supported. (Tr. 1190).

Here, substantial evidence supports the ALJ's determination that Ruiz's bipolar disorder, hearing loss, and degenerative disc disease of the lumbar spine and cervical spine were severe impairments, that Ruiz's Barrett's Esophagus, pancreatitis, and erectile dysfunction were non-severe impairments, and that Ruiz did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

Residual Functional Capacity (RFC) is what an individual can still do despite his limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at

*2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

Upon this record, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Ruiz's physical and mental impairments. The ALJ's RFC determination is consistent with the conclusion of Dr. Hegde. Based on the totality of the evidence, the ALJ concluded that Ruiz could perform a wide range of light work; specifically, Ruiz is limited to lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; is able to sit, stand, and walk for six hours each throughout an eight-hour workday. The ALJ also noted that tendonitis in Ruiz's left shoulder prevented him from overhead reaching with the left upper extremity, but Ruiz is right-hand dominant. The ALJ also concluded that Ruiz was able to occasionally crawl, crouch, kneel, stoop, and climb ramps and stairs; required the option to alternate between sitting and standing every hour; was limited to performing simple, routine, repetitious work with one or two or three step instructions; was limited to a supervised, low-stress environment requiring few decisions; was limited to only occasional interaction with co-workers and supervisors and no interaction with the general public; was unable to work with strict production quotas and fast production rate pace, due to limitations in concentration, persistence, and pace; was unable to work in a noisy work environment without noise protection; was able to frequently operate a motor vehicle; was limited to occasional exposure to environments with extreme cold, vibration, wetness, and humidity; was limited to occasional exposure to hazardous work environments involving dangerous machinery, and could not be exposed

to hazardous work environments involving unprotected heights and climbing ropes, ladders, or scaffolding. (Tr. 262). The ALJ gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455. The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory; is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques; or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more

well-founded than another," and where the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458; *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 507-11 (S.D. Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

According to Ruiz, the ALJ erred in discounting the treating records of his treating physicians, Dr. Wanda J. Henao, Dr. Dana Clark, and Dr. Casantha Orocotsk, and instead relying heavily on the opinion of a non-examining State agency psychiatrist and consulting orthopedic specialist, Dr. Barnes. (Tr. 269, 273). Ruiz argues that the ALJ's rejection of the treating source opinions has even less support than that of the ALJ in *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). In *Myers*, the Fifth Circuit remanded the case because the ALJ rejected the opinion of the treating physician and explicitly relied on the opinion of a non-examining SSA doctor who testified at the hearing. Ruiz further argues that the ALJ failed to identify the amount of weight she gave to the opinion of Dr. Kriste E. Babbitt and failed to have a medical expert testify at the administrative hearing, contrary to the suggestions of the Appeals Council.

The Commissioner counters that the ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical

sources. The Commissioner responds that the ALJ does not have to accord considerable weight to a treating or examining physician's opinion or diagnosis. For example, the Commissioner argues that the ALJ did consider Dr. Clark's opinion because she gave Dr. Clark's opinion "little weight," which is contrary to Ruiz's argument that "the ALJ fail[ed] to assess the medical opinions of . . . Plaintiff's treating physician, Dr. Dana Clark." (Document No. 13, p. 23).

As for the lack of an explanation for the weight given to Dr. Babbitt's opinion, the Commissioner responds that Dr. Babbitt's findings coincided with the findings of Ruiz's other treating and examining physicians to which the ALJ assigned some weight (Tr. 266-67). The Commissioner further argues that Ruiz failed to demonstrate the prejudice behind the ALJ's significant weight to the State agency medical consultant, Dr. Matthew Turner, who determined that Ruiz was limited to unskilled work (Tr. 273, 1194), the lowest work skill level. *See* 20 C.F.R. § 416.968(a) SSR 00-4p, 2000 WL 1898704.

With respect to the opinions and diagnoses of treating physicians and medical sources regarding Ruiz's mental complaints and substance abuse, the ALJ wrote:

> On January 29, 2012, a consultative examination was conducted by Dr. Rebecca Fisher to further evaluate the claimant's mental health. (Exhibit B13F) The claimant reported to Dr. Fisher that he suffered from depression with feelings of worthlessness, hopelessness, loneliness, and guilt. (Exhibit B13F, p. 1) In addition the claimant reported symptoms of anxiety such as excessive worry, difficulty controlling the worry, increased heart rate, and difficulty breathing. (Exhibit B13F, p. 2) On review, Dr. Fisher noted the claimant was calm and cooperative during the interview; his motor activity was normal; his thoughts were coherent, logical, and relevant; there was no evidence of loosening of associations, flight of ideas, or preservations; his mood was depressed; he was fully oriented; he recalled 6 of 6 digits foreword [sp.] and he immediately recalled 3 of 3 objects; and he accurately completed three simple mathematical equations. (Exhibit B13F, pp. 3-4) Dr. Fisher diagnosed the claimant with major depressive disorder, generalized anxiety disorder, and a GAF score of 50 [footnote omitted] (Exhibit B13F, pp. 4-5) I considered the opinion of Dr. Fisher.
>
> I found this opinion credible and gave it some weight. Although not a treating physician, Dr. Fisher was able to examine the claimant. Further, as she had a

history of completing consultative examinations for the Social Security Administration, Dr. Fisher was familiar with our regulations and practices. Further, Dr. Fisher's opinion was well supported by medically acceptable clinical and laboratory diagnostic techniques and was consistent with the other substantial evidence in the claimant's case record. (Tr. 264-265).

With respect to the opinions and diagnoses of treating physicians and medical sources

regarding Ruiz's degenerative disc disease of the lumbar and cervical spine, the ALJ wrote:

On January 3, 2012, the claimant underwent a consultative examination by Dr. Hanna Abu-Nassar (Exhibit B12F, pp. 1-8). A physical exam was essentially normal (Exhibit B12F, pp. 1-8). There was mild tenderness in the epigastrium and over the colon (Exhibit B12F, pp. 1-8). The claimant's back was normal without spasm (Exhibit B12F, pp. 1-8). The claimant's gait was slow and he was unbale to walk on his toes or heels (Exhibit B12F, pp. 1-8). A straight leg raise test was normal and sensation was normal (Exhibit B12F, pp. 1-8). Snellen's test showed bilateral uncorrected vision at 20/20 (Exhibit B12F, pp. 1-8). Dr. Hanna Abu-Nassar diagnosed the claimant with vision problems, history of chronic alcoholism, and history of reportedly abnormal malignant colonic polyp (Exhibit B12F, pp. 1-8). While there was little evidence of physical restrictions based on this evaluation, the claimant was subsequently involved in a motor vehicle accident resulting in back problems. Later MRI testing detailed below reflected more significant back problems, which were accounted for in the limitation to light work and an option to alternate between sitting and standing hourly. Due to subsequent development of the medical record, I gave only some weight to the opinion of Dr. Abu-Nassar.

On July 8, 2014, the claimant underwent a consultative examination by Dr. Frank Barnes, an orthopedic specialist (Exhibit B33F, B32F, pp. 1-11). Physical examination showed tenderness over the entire humeral head area of the left shoulder (Exhibit B32F, pp. 1-11). The claimant showed mild weakness of the entire left upper extremity, grade 4/5 (Exhibit B32F, pp. 1-11). There was no instability of the left shoulder (Exhibit B32F, pp. 1-11). The examination further noted the claimant held his spine rigidly and did not reverse it with flexion and extension (Exhibit B32F, pp. 1-11). The claimant had marked limitation of motion in the lumbar spine (Exhibit B32F, pp. 1-11). The claimant was tender at the L5 level, bilaterally (Exhibit B32F, pp. 1-11). No spasm was felt (Exhibit B32F, pp. 1-11). A straight leg raising test was painless while seated (Exhibit B32F, pp. 1-11). When supine, the claimant had pain on the right at 30° straight leg raising and on the left at 40° (Exhibit B32F, pp. 1-11). Pain was in the lower back. Dr. Barnes opined this was inconsistent and did not confirm radiculopathy (Exhibit B32F, pp. 1-11).

Sensory was normal in the lower extremities. Pelvic rocking caused lumbar pain and a tandem-walking test was unsteady (Exhibit B32F, pp. 1-11). Dr. Barnes diagnosed the claimant with left shoulder tendonitis, L5 to S1 disc diseased, and by

20

history diabetes mellitus, hypertension, peptic ulcer disease, probably prostatism, and a history of pancreatitis and anxiety (Exhibit B32F, pp. 1-11). Based on his examination, Dr. Barnes completed a medical source statement indicating the claimant was able to lift and carry up to twenty pounds, occasionally and ten pounds, frequently (Exhibit B32F, pp. 1-11). Dr. Barnes noted limited left shoulder motion, limited lumbar motion and abnormal tandem walking test as support for his exertional limitations (Exhibit B32F, pp. 1-11). Dr. Barnes opined the claimant was limited to siting [sp], standing, and walking for two hours each at one time (Exhibit B32F, pp. 1-11). Dr. Barnes further opined the claimant was able to sit, stand and walk for eight hours each in an eight-hour workday (Exhibit B32F, pp. 1-11). The claimant was limited to no overhead reaching with the left upper extremity and no climbing of ladders or scaffolds (Exhibit B32F, pp. 1-11). Dr. Barnes further opined the claimant should not be exposed to unprotected height (Exhibit B32F, pp. 1-11). The claimant could occasionally be exposed to moving mechanical parts, humidity, wetness, extreme cold and vibrations (Exhibit B32F, pp. 1-11). I considered this opinion and afforded it great weight as Dr. Barnes was specialized in orthopedic surgery and his opinion was consistent with his examination findings as well as the medical evidence of record generally. (Tr. 268-269).

With respect to the opinions and diagnoses of treating physicians and medical sources regarding Ruiz's hearing loss, the ALJ wrote:

On December 19, 2012, the claimant underwent audiology testing which showed hearing sensitivity: sensorineural, mild, moderate, and high frequency (above 2kH2) bilaterally (Exhibit B19F, p. 49). The recommendations of the specialist administering the test, Mr. Betty Pittman, MA, CCC-A were noise protection in all noisy environments and follow up with anent (Exhibit B19F, p. 49). I considered these results and recommendations and I accordingly limited the claimant to from working in a noisy work environment, such as construction work or work on a highway, without noise protection. (Tr. 271).

With respect to the other opinion evidence, the ALJ wrote:

As for the opinion evidence, I considered the opinions provided by the State Disability Determination Services (DDS). I considered the exertional opinion at Exhibit B14F and gave it little weight as there was no indication that pancreatitis was a chronic condition (See Exhibit B14F). I further considered the medical opinions of Dr. Rehman and Dr. Shade at Exhibits B10F and B11F and I gave these assessments of insufficient evidence little weight, as there appeared to be enough evidence to form an opinion regarding the claimant's functional abilities. Finally, I considered the opinion of Dr. Matthew Turner at Exhibit B16F and B15F, which detailed the claimant's limitations to unskilled work. I gave this opinion significant weight, as it was generally consistent with the objective medical evidence (See Exhibit B13F). (Tr. 273).

Here, the thoroughness of the ALJ's decision shows that she carefully considered the medical records and testimony, and that her determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources. The ALJ explained her rationale for discounting the opinion of Dr. Nassar. As for Ruiz's arguments concerning the opinions of Dr. Henao, Clark, and Orocotsk, the law is clear that good cause exists for an ALJ to provide little weight to a treating physician's questionnaire opinion due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations. *See Foster v. Astrue*, 410 Fed. Appx. 831, 833 (5th Cir. 2011) ("[T]he 'questionnaire' format typifies 'brief or conclusory' testimony . . . [W]e agree with the magistrate judge's conclusion that 'due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examinations, the [treating physician's] opinion is given little weight."); *Nguyen v. Colvin*, No. 4:13-CV-2957, 2015 WL 222328, at *9 (S.D. Tex. Jan. 14, 2015). The ALJ gave detailed reasons in assigning weight to the medical source opinions of Dr. Barnes and Dr. Turner, including consultative examination reports. Given the proper discounting of the opinions of Dr. Nassar, Dr. Rehman, and Dr. Shade, concerning Ruiz's pancreatitis and vision problems, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability

22

Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment that could reasonably be expected to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. The regulations provide a two-step process to evaluate a claimant's alleged symptoms. *See* 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must consider whether there is an underlying medically determinable impairment that could reasonably be expected to produce the individual's symptoms, such as pain. 20 C.F.R. §§ 404.1529, 416.929. Second, the ALJ evaluates the intensity, persistence of the symptoms, and limiting effects of the symptoms on the claimant's ability to do basic work-related activities. *Id.* This evaluation entails the ALJ considering the record, including medical and laboratory findings, the opinions of treating and non-treating medical sources, and other factors relevant to the claimant's symptoms such as daily activities; location, duration, frequency and intensity of pain and other symptoms; and measures taken (such as medication, treatment or home remedies) to alleviate those symptoms, factors that precipitate and aggravate the symptoms, the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms, treatment, other than medication, which the claimant receives or has received for relief of pain or other symptoms, any measures other than treatment the claimant uses or has used to relieve pain or other symptoms, and any other factors concerning the claimant's functional capacity, limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929 (c). A claimant's testimony must be consistent with the objective medical evidence. 20 C.F.R. §§ 404.1529(a), 416.929(a). "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly

unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment that can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166. Thus the ALJ's evaluation of the claimant's subjective complaints is entitled to deference if supported by substantial evidence. *See Newton*, 209 F.3d. at 459.

Ruiz testified about his health and its impact on his daily activities. He offered no testimony or corroboration from his family or friends, such as his adult son (Tr. 293), with respect to his complaints about his condition. Ruiz testified that he was homeless (Tr. 293). He testified that he was last employed as a pipe fitter helper for about six months to help with the aftermath of Hurricane Ike (Tr. 319) but could not remember his dates of employment. (Tr. 294). The record showed that he had been employed by Brock Services in 2008, working twelve hours a day and seven days a week, and was paid over $12,000 that year. (Tr. 3800). He testified that he had been a drummer a long time ago but stopped (Tr. 295) and had worked for six months picking up trash in a refinery. (Tr. 296). Ruiz testified that he began using drugs in his twenties, including marijuana, cocaine, and alcohol (Tr. 296), but had stopped around May 2014. (Tr. 297). He was diagnosed with alcoholic pancreatitis on May 19, 2014 (Tr. 297, 1607). He testified that he had attempted to stop drinking twenty times but never attended a rehabilitation program because of school and church. (Tr. 298). He testified that he had not used any alcohol or drug substances on the day of the hearing. (Tr. 316).

To obtain food, Ruiz testified that he did not get food stamps from the State of Texas. (Tr. 297-298). Instead, he went to food pantries and homeless shelters and called a friend who was a nurse. (Tr. 298-299), whom he took care of when she was paralyzed. (Tr. 300). He did a lot of walking during the day from one homeless shelter to the next to get food. (Tr. 310) and was able to carry groceries in a grocery bag from the pantries to the car. (Tr. 331).

Ruiz testified that he had pain in his lower back. (Tr. 311) and could feel the pain when tying his shoes. (Tr. 312). He testified that he could sit for half an hour at a time before the pain returns. (Tr. 312). Two doctors had recommended back surgery, but he was afraid (Tr. 311) and preferred to take pain medicine instead. (Tr. 312). The medication relieved the pain for one or two hours each time. (Tr. 313). He had received epidural steroid injections for his lower back every two weeks (Tr. 313, 1494), and each time he was put to sleep. (Tr. 314). He testified that the injections would relieve the pain for a "a few weeks, until you get the other one. And then you feel good again. And then you have to go back." (Tr. 314). He testified that the doctors suggested surgery because it would be "too expensive" to keep giving him the injections. (Tr. 314).

In addition to lower back pain, Ruiz testified that he had pain in the left shoulder due to tendonitis, which is why he no longer plays the drums. (Tr. 317). He testified that he hurt his shoulder when he fell in a refinery (Tr. 328); he did not file a worker's compensation claim. (Tr. 328). He testified that he could lift less than five pounds in his left arm but could not lift his left arm above shoulder level. (Tr. 318). However, he also testified that he is right-hand dominant and could lift his right arm above shoulder level. (Tr. 318). He testified that the doctor told him to "do some exercises" to resolve the pain. (Tr. 318). Ruiz also testified that he was diabetic and was taking medication for it. (Tr. 315). He also testified that his feet were swollen (Tr. 315) and

that he could only stand in one spot for about an hour. (Tr. 316). Ruiz testified that he was able to wash his own hair and take a shower on his own. (Tr. 327).

As for his "mental problems" (Tr. 299), Ruiz testified that he began seeing and hearing things after his former girlfriend, whom he was going to marry, betrayed him five years prior. (Tr. 299-301). Ruiz testified that he had a difficult time getting along with people and forming long-term relationships because of his bipolar disorder (Tr. 302), and blamed his bipolar disorder for not being able to work full-time. (Tr. 328-329).

Ruiz testified that he took a list of thirteen medications as prescribed by a psychiatrist at the Lord of the Streets, "a mental facility for homeless people" (Tr. 303) that he visited twice a week. (Tr. 304). The medication included Seroquel for his anxiety and bipolar disorder, Trazadone, Amitriptyline, hydrocodone, naproxen, Tramadol, and "a number of other[s]." (Tr. 304-305). He took Metformin twice daily (Tr. 306), Gabapentin three times daily (Tr. 306), two tablets of Seroquel at night daily (Tr. 307), Risperidone nightly (Tr. 307), and Abilify three times daily. (Tr. 308). Ruiz testified that Simbasgatin (Tr. 307), prescribed for high cholesterol, was "affecting [his] liver." (Tr. 307). Ruiz testified that the sleep medications made him "big time drowsy" (Tr. 309) and "[not] want to do anything . . . just want to be laying down . . . don't even watch TV anymore." (Tr. 309). He testified that the Seroquel made him "fall asleep . . . [e]verywhere" (Tr. 332) but that he continued to take it to help him sleep at night. (Tr. 332-333). He also testified that he had lost around ten pounds (Tr. 331) by going to the YMCA sauna with a disabled friend from the homeless shelter. (Tr. 331).

Ruiz testified that he had been incarcerated for one year and seven months in Brooks County Jail, in Falfurrias, Texas (Tr. 320-323), and on probation for six years (Tr. 318-319), for

unknowingly transporting drugs in a truck through a checkpoint for $100. (Tr. 321-322). He had

four DWIs twenty years prior. (Tr. 319).

Ruiz described his goal as being able to obtain his GED, which has thus far been difficult

because his medication has been "too strong" (Tr. 292), to which doctors responded that they were

"side effects" that were "going to happen." (Tr. 317). Ruiz testified that someone had stolen his

social security number and used it to earn income. (Tr. 327-328).

The ALJ concluded that Ruiz's complaints concerning the intensity, persistence, and

limiting effects of his symptoms were not entirely credible. (Tr. 273). The ALJ wrote:

> At the previous hearing held October 26, 2012, the claimant testified that he had an
> extensive history of both alcohol and drug abuse, but further stated that he no longer
> drank alcohol and he had not used cocaine in 3 to 5 years (Hearing Testimony). At
> the hearing held on December 11, 2014, the claimant testified he last used
> marijuana or cocaine four to five years earlier (Hearing Testimony). At the
> December hearing, the claimant admitted to using alcohol as recently as May of
> 2014 (Hearing Testimony). The claimant further testified that he could not recall
> exactly when he last used alcohol prior to May of 2014, but it had been "a long
> time" (Hearing Testimony). However, medical records indicated reports of alcohol
> use in 2011 and subjective reports of crack cocaine use in 2012 (*See* Exhibit B6F,
> p. 3 and B19F, pp. 26, 11, respectively). There were also indications of the claimant
> injuring himself, walking around his home – drunk – in May 2012 (*See* Exhibit
> B19F, pp. 26, 11). Treatment records from May of 2014 indicated subjective
> reports of excessive drinking and non-prescribed use of pain medication (Exhibit
> B37F, p. 140). In addition, laboratory testing from May 2014 was positive for
> cannabinoid and opiates (Exhibit B31F, p. 3). Although the inconsistent
> information provided by the claimant might not have been the result of a conscious
> intention to mislead, the inconsistencies suggested that the information provided by
> the claimant might not be entirely reliable.
>
> At the hearing held October 26, 2012, the claimant testified that he had lied to his
> physicians in an attempt to receive additional medications, which further eroded his
> credibility and suggested the alleged symptoms and limitations provided by the
> claimant throughout the record were overstated (Hearing Testimony). It must also
> be noted that although the claimant was diagnosed with bipolar disorder, at least
> one treating physician refused to prescribe benzodiazepines due to the claimant's
> lack of credibility and changing stories (Exhibit B19F, p. 3). At least one
> practitioner has suggested the claimant was malingering. (Exhibit B36F, p. 9=8
> [*sic*]). Such notations by the claimant's treating physician further diminished the
> claimant's overall credibility. There were similar concerns noted throughout the

medical record (*e.g.*, Exhibit B29F, p. 47, B31F, p. 7). In addition, there was evidence to show the claimant had taken Vicodin for pain other than in his back pain (non-prescribed uses) on more than one occasion (*e.g.*, Exhibit B37F, pp. 127, 140). Furthermore, the claimant reportedly purchased the Vicodin on the street (Exhibit B37F, 140). While the claimant testified only as to his use of Cocaine, Marijuana, and alcohol, he did testify that he did not have time to do drugs or drink alcohol anymore (Hearing Testimony). I did not find the claimant's testimony regarding his drug and alcohol use was credible.

At the hearing held December 11, 2014, the claimant testified he was able to attend to his personal hygiene independently (Hearing Testimony). The claimant further testified he attended coursework for a GED and he attended church and medical appointments regularly (Hearing Testimony). Such activities suggested a much higher level of functioning than presented by the claimant to this tribunal. These conflicting presentations and activities contrasted with purported limitations did not enhance the claimant's overall credibility. The claimant's description of daily activities was not limited to the extent one would expect, given the complaints of disabling symptom and limitations. Overall, the claimant's reported limited daily activities and functional limitations were outweighed by the other factors discussed in this decision. The claimant also reported no history of illicit drug use at the consultative examination, although he did admit to an arrest for possession of marijuana, as he was on probation at the time (Exhibit B13F, p. 3). At the hearing held October 26, 2012, the claimant admitted to 3 or 4 charges for driving while intoxicated (Hearing Testimony). The claimant similarly testified at the hearing held December 11, 2014 (Hearing Testimony). Such reporting to the consultative examiner suggested that the claimant had intentionally misled the consultative examiner, and it negatively affected the claimant's overall credibility. Similarly, the claimant's hearing testimony regarding drug use was quite vague and inconsistent. For instance, the claimant testified that it had been four to five years since he had used marijuana, but he tested positive for the substance as recently as May 2014. Finally, I noted the claimant had alleged a traumatic brain injury, but other than self-reports to providers, there was no medical evidence substantiating such an injury, nor any associated limitations. The medical records were completely void of any treatment for a trauma to the head.

Overall, the claimant's testimony of experiencing disabling pain and limitations is not corroborated in the overall record. For the reasons detailed above, I considered, but granted little probative weight to the claimant's testimony. As discussed above, the evidence did not support the claimant's ultimate allegation of disabling pain and limitations.

After careful consideration of the evidence, I found that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. (Tr. 272-273).

Ruiz argues that the ALJ failed to properly evaluate his alleged subjective complaints. According to Ruiz, the ALJ based her finding that Ruiz is not disabled on her finding that Ruiz's complaints were not credible because of his longstanding history of substance abuse (Document No. 13, p. 7). Ruiz argues that SSR 96-7p has been superseded by SSR 16-3p, which now makes clear that the subjective symptoms evaluation is not an examination of an individual's character and "eliminates the use of the term 'credibility' from the Agency's subregulatory policy" (Document No. 13, p. 15). Ruiz contends that even when SSR 96-7p was in effect, the ALJ was required to "consider Plaintiff's reasons and determine if they were 'justifiable' reasons for not following medical advice or not taking prescribed medication (SSR 82-59)" (Document No. 13, p. 11). Ruiz argues that SSR 16-3p should be applied retroactively. He contends that the ALJ assumed facts that were not in evidence to support her finding that Ruiz's complaints lacked credibility. He also argues that the ALJ's findings on Ruiz's credibility lack consistency because the ALJ found that Ruiz's testimony regarding the activities he performed was credible but found that his complaints of pain resulting from those activities were not credible. (Document No. 13, pp. 12-13).

The Commissioner counters that the ALJ did not commit legal error in evaluating Ruiz's credibility. Rather, she complied with the governing legal authorities at the time the decision was issued on March 13, 2015, which was more than a year before the effective date of March 28, 2016, for application of SSR 16-3p. (Document No. 14, p. 3). The Commissioner further argues that, even assuming SSR 16-3p applied retroactively, "the ALJ's mere use of the word credibility would not constitute error *per se*" (Document No. 14, p. 3) because she "used the term 'credibility' not to impugn Plaintiff's character, but rather as a reference to the inconsistencies

between Plaintiff's subjective complaints and the objective evidence in the record (Tr. 252-73)." (Document No. 14, pp. 3-4). The Magistrate Judge agrees.

On March 16, 2016, SSR 96-7p was superseded by Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p, 2016 WL 1020935, at *1 (S.S.A. Mar. 16, 2016). SSR 96-7p was in effect when the ALJ issued his decision. Absent explicit language to the contrary, administrative rules do not ordinarily apply retroactively. *See, e.g., Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."). SSR 16-3p does not explicitly state that it applies retroactively. Courts that have compared SSR 96-7p and SSR 16-3p have found that the new ruling was designed to clarify rather than change existing law. *See Mayberry v. Colvin*, G-15-330, 2016 WL 7686850 (S.D. Tex. Nov. 28, 2016), *report and recommendation adopted*, 2017 WL 86880 (Jan. 10, 2017) citing to cases that have reached the same conclusion, such as *Rockwood v. Colvin*, No. 15 C 192, 2016 WL 2622325, at *3 n. 1 (N.D. Ill. May 9, 2016); *Burnstad v. Colvin*, Case No. 6-15-cv-921-SI, 2016 WL 4134535, at 11 n.9 (D.Or. Aug. 2, 2016)*; Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App 113, 119 n. 1 (6th Cir. 2016).

Here, the ALJ applied SSR 96-7p, and evaluated the objective evidence in light of Ruiz's subjective complaints. Notwithstanding the ALJ's use of the term "credibility," the ALJ's decision shows that she did not discount Ruiz's subjective symptoms based on his character or veracity but cited to specific evidence in the record, which the ALJ found undermined Ruiz's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994) (recognizing that while the ALJ "must articulate reasons for rejecting the claimant's subjective complaints of pain" the court has declined to apply a "rigid approach"). The ALJ analyzed Ruiz's treatment

records, work history, function reports and testimony. Based on that information, the ALJ concluded that Ruiz's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (Tr. 273). The totality of the ALJ's decision shows that she did not impugn Ruiz's character or state that he was untruthful. *See Mayberry*, 2016 WL 7686850, at * 6 ("despite her contentions to the contrary, the ALJ did not impugn Mayberry's character or state that she was untruthful; instead the ALJ simply weighted the evidence in the record to determine whether it supported Mayberry's symptoms.") Because the ALJ properly evaluated Ruiz's subjective complaints, and weighed the medical evidence, as is clear from the detailed discussion of the record, remand is not warranted.

Therefore, the undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that she weighed the testimony improperly. This factor weighs in favor of the ALJ's decision.

**D. Education, Work History, and Age**

The final element to be weighed is the claimant's educational background, work history, and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot engage in any other kind of substantial gainful activity that exists in the national economy, due to his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Charlene Swisher, a vocational expert ("VE"), at the first hearing on October 26, 2012, and Vickie Colenburg, a VE, at the hearing in 2014. (Tr. 333-339, 386-387, 389-390, 513-515). "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working

conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir.

1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a

vocational expert's testimony, based on a properly phrased hypothetical question, constitutes

substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical

question is sufficient when it incorporates the impairments which the ALJ has recognized to be

supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must

give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions

(including additional disabilities not recognized by the ALJ's findings and disabilities recognized

but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following comprehensive hypothetical question to the VE Charlene

Swisher at the first hearing:

> Q. All right. Assume with me that we have a person closely approaching advanced
> age with a marginal education and past work experience as you've identified.
> Assume that the person is capable of performing a wide range of light work as
> defined by the social security regulations. Assume that the person can lift, carry,
> push and pull 20 pounds occasionally, 10 pounds frequently. And can sit, stand, or
> walk for a total of six hours a day each intermittently throughout the eight-hour
> work day. The person would be limited to performing simple, routine, repetitious
> work. With one or two step instructions. And would be limited to a supervised,
> low stress environment, requiring few decisions. With these restrictions, would
> such a person be able to do any of the past relevant work.
>
> A. Yes, your honor. The housekeeping job, yes.
>
> Q. Are there any other types of jobs that such a person could do in the national
> economy?
>
> A. Yes, your honor. The first position is that of a cafeteria attendant. This DOT
> code is 311.677-010. This is a light exertional level position. It is unskilled, SVP
> 2. There are approximately 1,500 positions in the Houston surrounding counties
> and approximately 175,000 positions in the national economy. The second position
> is that of a laundry press operator. This DOT code is 363.685-026. This is also a
> light exertional level position. It is unskilled, SVP 2. There are approximately
> 1,000 positions in the Houston and surrounding counties. And approximately
> 100,000 positions in the national economy. And the third position is that of a

parking lot attendant. This DOT code is 915.473-010. This is also a light exertional position. It is unskilled, SVP 2. There are approximately 600 to 800 positions in the Houston and surrounding counties. And approximately 60,000 to 100,000 positions in the national economy.

Q. If a person were to miss more than two days a month of work due to continued drug and alcohol abuse, would that person be employable in the national economy.

A. No, your honor.

Q. Is your testimony today consistent with the provisions of the <u>Dictionary of Occupational Titles</u>?

A. Yes, your honor. (Tr. 390-391).

Ruiz's counsel also questioned the VE. (Tr. 391-392):

Q. Assume that the hypothetical individual, because of mental problems or mental symptoms related would need to [take] a break every 20 minutes for about 5 minutes and would need to leave the work site. Would there be any jobs in the national economy that such an individual could perform –

A. No.

Q. -- eight hours a day, five days a week, 52 weeks a year?

A. No. Because that hypothetical limitation would require an accommodation by an employer. It is not consistent with competitive employment.

Q. And, assume hypothetical could sit for less than two hours, stand and walk for about two hours in an eight-hour work day, would that be compatible with sustained gainful employment in the national economy?

A. No.

Q. Assume that the hypothetical individual, during an eight-hour day, could have loss of attention and concentration for more than 1/3 of the eight-hour work day. Would there be any jobs in the national economy such an individua[l] could perform eight-hours a day, five days a week, 52 weeks a year?

A. No. Because that, again, would require an accommodation by an employer. It's not consistent with competitive employment. (Tr. 391-392).

The ALJ posed the following comprehensive hypothetical question to the VE Vickie

Colenburg at the second hearing:

Q. All right. Ms. Cullenberg [sp], Ms. Swisher was the VE at the last hearing and she identified the claimant's past relevant work as a drummer, musician at DOT 152.041-010. Light, skilled, SVP 8. Housekeeping/cleaner at DOT 323.687-014. Light, unskilled, at SVP 2. Do you agree with those descriptions?

A. I do, your honor.

Q. Could you also help us understand how the DOT classifies pipe fitter, helper?

A. Yes, your honor. That job, according to the DOT is heavy, semi-skilled with an SVP of 3. DT 862.684-022.

Q. Okay. Are there transferrable skills that could be utilized in other jobs?

A. No, your honor.

Q. All right. All right. I'm going to style this a hypothetical number two since we had hypothetical number on[e] in the first hearing. Assume with me that we have a person closely approaching advanced age with a marginal education and past work experience as you've identified. Assume that the person's capable of performing the exertional demands of a wide-range of light work as defined by the social security regulations. Assume that due to degenerative disc disease of the spine, the hypothetical person would be limited to lift and carry, push and pull only 20 pounds occasionally and 10 pounds frequently. And could sit, stand, or walk for a total of six hours a day each throughout the eight-hour work day. The hypothetical person would need a sit/stand option every hour due to degenerative disc disease of the back. The hypothetical person, due to tendonitis of the left shoulder, should have no overhead reaching with the left upper extremity. The hypothetical person is right hand dominant. There should be no noisy work environments such as a construction site or on a highway, without noise protection. There should be no more than frequent operation of a motor vehicle. And the person would be limited to occasional crawling, crouching, stooping, kneeling and climbing of stairs or ramps. Also, there should be no more than occasional exposure to environments with extreme cold, humidity, or wetness or vibration. There should be no more than occasional exposure to hazardous work environments involving use of dangerous machinery and there should be no exposure to hazardous environments involving exposure to unprotected heights or the use of scaffolding, ropes, or ladders. And finally, due to allegations of mental health conditions, the hypothetical individual would be limited to performing simple, routine, repetitious work with one, two, or three step instructions in a supervised, low stressed environment requiring few decisions. There should be only occasional interaction with co-workers and supervisors and no contact with the general public as part of job functions. There should be no strict production quotas and no fast production pace due to limitations in concentration, persistence and pace. With these restrictions, could such a person be able to do any of the past relevant for [*sic*]?

A. No, your honor.

Q. And you said there were no transferrable skills?

A. Correct.

Q. Are there any jobs that you can identify in the national economy at the light, unskilled level with these restrictions?

A. Yes, your honor. Price tagger. 209.587-034. Over 6,000 in the state of Texas. Over 95,00[0] nationally. Mail clerk, non-postal. 209.687-026. Over 5,500 in the state of Texas. 115,000 nationally. And laundry folder. 369.687-018. Over 10,000 in the state. Over 150,000 nationally. These are light, unskilled. (Tr. 333-336).

Ruiz's counsel also questioned the VE. (Tr. 336-339).

Q. Assume that the hypothetical individual would need constant one to one supervision, eight hours a day, five days a week in the work place. Would there be any jobs in the national economy such an individual could perform eight hours a day, five days a week, 52 weeks per year [?]

A. No, sir. He wouldn't be able to sustain competitive employment.

Q. Assume the hypothetical individual has the residual functional capacity for light work. No bending, no stooping, and no climbing. In addition, the claimant would need to take three breaks [that] would last for about 15 minutes of education [*sic*]. Would there be any jobs in the national economy such an individual could perform eight hours a day, five days a week, 52 weeks a year on a sustained basis [?]
A. No, sir.

Q. Assume second – next hypothetical, claimant has an RFC for light work. Can sit, stand, and walk each intermittently. And what is meant by that is he would have to take a break, again, for three breaks beyond the normal three that's granted. Regardless of which activity he was doing. Would such an individual be able to perform any jobs in the national economy?

A. No, sir.

Q. And explain why not.

A. Because the amount of the extended breaks and he would not perform his work activity.

Q. Now, assume that the hypothetical individual would need to be prompted for each occasion to complete a given task that he would be given by his supervisor. He'd have to be prompted and this would occur one time per hour. How would that

affect his ability to perform work in the nation[al] economy based upon your experience as a vocational expert [?]

A. Based on my experience, sir, that's more like job coaching and that's not tolerated in competitive employment. So, he would not be able to sustain competitive employment.

A. All right. Next hypothetical, assume a hypothetical individual because of psychologically vague symptoms his demeaner [sic] of the job would be unpredictable. Meaning, he would go from crying in one moment to being happy the next moment. This would occur two to three times per week. It would be unpredictable, but it would cause distraction from the co-employees from completing their task during the period of time that occurred. Would that be – how would that affect the person's ability to work eight hours a day, five days a week, 52 weeks a year in the national economy?

A. Not being the employee – the employer would not tolerate that behavior. Work productions, slowdowns, that hits the claimant as well as the employees. And again, that behavior would not be tolerated so he would make so he would maintain the [INAUDIBLE].

Q. If the job environment is a predictable environment --

A. Yes, sir.

Q. requiring in order – for most of employees to complete the job their [sic] required to do?

A. [INAUDIBLE]

Q. Is a predictable environment?

A. Yes, sir. (Tr. 336-339).

A hypothetical question is sufficient when it incorporates the impairments that the ALJ has recognized to be supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Ruiz was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Ruiz could perform work as a laundry folder, a non-postal mail clerk, and a price tagger. (Tr. 274, 336). The Court concludes that the ALJ's reliance on the vocational

testimony was proper, and that the vocational expert's testimony along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Ruiz was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Ruiz was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 13) is DENIED, Defendant's Cross-Motion for Summary Judgment (Document No. 9) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 9th day of August, 2017.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE